*United States v. Burvick*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 31st day of July, two thousand twenty-six.

PRESENT:
> SUSAN L. CARNEY,
> MICHAEL H. PARK,
> BETH ROBINSON,
> *Circuit Judges.*

---

UNITED STATES OF AMERICA,

> *Appellant*,

> v.                                     No. 25-351

ROY BURVICK,

> *Defendant-Appellee.*

---

For Appellant:                     ARUN BODAPATI (Dylan A. Stern, *on the brief*), Assistant United States Attorneys, *for* Joseph Nocella, Jr., United States Attorney for the Eastern District of New York, Brooklyn, NY.

For Defendant-Appellee:       ALLEGRA GLASHAUSSER, Federal Defenders of New York, Inc., New York, NY.

Appeal from an order of the United States District Court for the Eastern District of New York (Nina R. Morrison, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the January 17, 2025 order of the district court is **REVERSED** and the case is **REMANDED**.

The government appeals from an order granting in part the motion to suppress filed by Defendant-Appellee Roy Burvick. After police questioned him on a public street, frisked him, and recovered a firearm from his cargo pants pocket, Burvick was arrested and charged with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Burvick moved to suppress the firearm and other physical evidence obtained from his person during the frisk, as well as his statements to police officers after his arrest. The district court reserved decision as to Burvick's post-arrest statements but granted his motion as to the firearm and other physical evidence, holding that they were the fruit of an unlawful stop-and-frisk. The government now challenges the district court's suppression order, arguing that Burvick was neither unlawfully seized nor unlawfully searched. We assume the parties' familiarity with the underlying facts, the video recordings of the stop, the case's procedural history, and the issues on

appeal, to which we refer only as necessary to explain our decision to reverse and remand.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. "Warrantless searches and seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).[1] A brief investigative stop-and-frisk—commonly referred to as a *Terry* stop-and-frisk— presents one such exception. *See id.*; *Terry v. Ohio*, 392 U.S. 1, 25–31 (1968). Police officers may temporarily detain a person for investigative purposes upon "reasonable suspicion" that the individual has "engaged in or is about to engage in criminal activity." *United States v. Hawkins*, 37 F.4th 854, 857 (2d Cir. 2022). When officers also have reasonable suspicion that the individual whom they stop is "armed and dangerous," they may in addition conduct a "limited search" of the individual's person for weapons. *Terry*, 392 U.S. at 24, 27. The reasonable suspicion standard is less demanding than probable cause, as we discuss further below. *Hawkins*, 37 F.4th at 857.

But "[n]ot every encounter between a police officer and an individual is a seizure implicating the [F]ourth [A]mendment's protections." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990). Officers may "approach[] individuals on the street or in other public places" and "pose questions, ask for identification, and request consent to search" without reasonable suspicion. *United States v. Drayton*, 536 U.S.

---

[1] Unless otherwise indicated, in this order we omit all internal quotation marks, alteration marks, emphases, footnotes, and citations from quoted language.

3

194, 200–01 (2002). No seizure has occurred unless and until "a reasonable person" would not "feel free to terminate the encounter." *Id.* at 201. "Essentially, this inquiry is an objective assessment of the overall coercive effect of the police conduct." *Lee*, 916 F.2d at 819.

We review *de novo* the district court's determinations of when a seizure occurred and whether reasonable suspicion supported a stop-and-frisk. *Hawkins*, 37 F.4th at 857. The court's "factual findings underlying th[ese] determination[s] are reviewed for clear error," *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 340 (2d Cir. 2000), even when they are "based . . . on physical or documentary evidence or inferences from other facts," *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). We afford "special deference to findings that are based on determinations of witness credibility." *Hawkins*, 37 F.4th at 857.

## I. Burvick was not seized when officers asked him for his security guard license; he was seized later in the encounter.

We must first determine when Burvick was seized, and thus at what point the officers' conduct must have been supported by reasonable suspicion. The district court held that Burvick was not seized when he complied with Officer Vanzanten's request that Burvick "come here for a second" at the beginning of his encounter with police. *United States v. Burvick*, No. 23-cr-450, 2025 WL 240976, at *9 (E.D.N.Y. Jan. 17, 2025). It concluded, still, that this "consensual encounter" had "transform[ed] . . . into an involuntary seizure" by the time officers asked him to show them his security guard license, roughly one and one-half minutes into the exchange. *Id.* at *10. On a *de novo* assessment of "all the circumstances surrounding the encounter," *Drayton*, 536 U.S. at 201, and cognizant of Supreme Court and Second Circuit precedent declining to find a seizure in settings we see as more

4

coercive, we are constrained to disagree with the district court's conclusion that, by this point in the encounter, a reasonable person would not have believed they were free to leave.

For example, in *Drayton*, the Supreme Court addressed a police encounter that occurred on a Greyhound bus. The bus driver allowed three police officers to board during one of the bus's scheduled stops "as part of a routine drug and weapons interdiction effort." *Id.* at 197. The officers "were dressed in plain clothes and carried concealed weapons and visible badges." *Id.* One officer positioned himself at the front of the bus, kneeling on the driver's seat and facing the rear of the bus; a second officer stationed himself at the rear of the bus, facing forward; and the third officer moved through the bus, asking passengers about "their travel plans," and seeking to "match passengers with luggage in the overhead racks." *Id.* at 198. The officers testified that passengers could have "declined to cooperate" and were free "to exit the bus at any time." *Id.* The questioning officer did not, however, "inform[] passengers of their right to refuse to cooperate." *Id.*

When the questioning officer approached the two defendants, who were seated together on the bus, he held up his badge, identified himself as a police officer, and explained to the defendants that the officers were "attempting to deter drugs and illegal weapons being transported on the bus." *Id.* The defendants consented to the officer's request to search their bag, and later to his requests to search their persons. The officer found no contraband in the bag, but detected "hard objects similar to drug packages" while patting down their thighs. *Id.* at 199. These objects were later revealed to be plastic bundles of powder cocaine that the defendants had duct-taped to their underwear. The defendants sought to suppress

the cocaine, in part on the ground that the suspicionless bus stop and questioning amounted to an unreasonable seizure.

The Supreme Court rejected this argument and held that the defendants were not seized during the officer's questioning. The Court emphasized that, although the questioning officer displayed his badge and did not explicitly inform passengers that they could refuse his requests, he spoke "in a polite, quiet voice," and did not "brandish . . . weapon[s]," "make any intimidating movements," physically block individuals from exiting the bus, or otherwise imply that the individuals being questioned could not terminate the encounter. *Id.* at 203–04. Especially apt here, the Court stressed that it was "beyond question that had this encounter occurred on the street, it would be constitutional." *Id.* at 204. That the encounter took place on a bus did not "transform [it] into an illegal seizure." *Id.*

The *Drayton* Court further emphasized that whether the police officers were in uniform or plainclothes carried "little weight in the analysis." *Id.* "Officers are often required to wear uniforms," it explained, and "in many circumstances this is cause for assurance, not discomfort." *Id*. Similarly, the Court stressed that "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon," since it is "well known to the public" that most law enforcement officers are armed. *Id.* at 205.

Further, in *Lee*, our Court addressed a police encounter in an airport terminal. Two plainclothes police officers approached the defendant as he was exiting the terminal by the baggage claim area, and "with credentials displayed, asked if they could speak with him." 916 F.2d at 816. He consented, and, at the suggestion of one of the officers, they walked to a corner of the terminal. The

officers asked the defendant various questions and inspected both his driver's license and plane ticket. The defendant eventually "asked why he was being questioned and was informed by [one of the officers] that he was suspected of carrying contraband." *Id.* at 817. He invited the officers to search his person and a bag he was carrying, and these searches revealed no contraband. Meanwhile, however, in another part of the baggage claim area, two additional police officers found a plastic bag containing cocaine inside a suitcase that they suspected belonged to the defendant. The defendant sought to suppress the cocaine, in part on the ground that he was unlawfully seized during the officers' questioning.

Our Court held that the encounter was not a seizure. We emphasized various factors in reaching this conclusion, including that the encounter "took place in a public area"; the officers made "no show of force or physical touching"; they did not impede the defendant's movement; the tone of their conversation was "neither threatening nor offensive"; and the officers "promptly returned" the defendant's airplane tickets and driver's license after examining them. *Id.* at 819. That one police officer told the defendant he was suspected of carrying contraband was "[t]he only factor that might arguably be construed as an indication that Lee was not free to leave," we explained. *Id.* We concluded, however, that when "[v]iew[ed] . . . in context, it is clear that the officer—in response to [the defendant's] own inquiry—was merely verbalizing something that was already quite obvious from the circumstances." *Id.* This "single statement" thus did not "transform[] an otherwise consensual encounter into a [F]ourth [A]mendment seizure." *Id.*

Here, the police officers' initial questioning of Burvick—up to and including their request to see his security guard license—was not more coercive than the police encounters in *Drayton* and *Lee*. Burvick was approached by three police officers as he was entering the garden in front of his home. The location in which Burvick was questioned was inherently less coercive than an enclosed bus or the corner of a baggage claim area: as the district court observed, the entire exchange occurred "on a public sidewalk in full view of other neighbors and passersby," with several people and a dog in fact strolling by and between the officers and Burvick. *Burvick*, 2025 WL 240976, at *3, *5. The tone of the officers' conversation with Burvick, too, was "not threatening or offensive," and the officers did not touch him and or block him from leaving the sidewalk conversation and entering his home, which stood "behind him" as he spoke to the officers. *Id.* at *3, *10. And unlike the officers in *Drayton* and *Lee*, Officer Vanzanten expressly informed Burvick that he could refuse the officers' requests to search his person, and Burvick in fact did so. *Id.* at *4.

True, the officers who approached Burvick "wore police uniforms" and their weapons, although holstered, were "displayed." *Id.* at *10. As explained above, however, the Supreme Court has instructed that these two factors are due "little weight" when determining whether an individual was seized. *Drayton*, 536 U.S. at 204. That the officers asked "fairly detailed" questions about Burvick's "employment, license status, and activities that day," *Burvick*, 2025 WL 240976, at *11, asked Burvick for permission to search his person, and requested his security guard license likewise did not transform the encounter into a *Terry* stop under our case law. *See Drayton*, 536 U.S. at 201 ("Even when law enforcement officers have

8

no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means.").

The only other factors that might reasonably be understood as creating a coercive effect up to the point when the officers asked to inspect Burvick's security guard license are that (1) Burvick's conversation with police began with Officer Vanzanten saying to Burvick, "Sir, come here for a second," and that (2) "[w]ithin the first minute of the encounter, Officer Vanzanten told Burvick that an unnamed person [had called] 911 on him and that [he] fit the description of whomever the caller had accused." *Burvick*, 2025 WL 240976, at *3, *9–*10. We agree that in some circumstances such statements could "be construed as an indication that [one is] not free to leave." *Lee*, 916 F.2d at 819. In this case, however, Officer Vanzanten's tone was calm and even, and the remarks were quickly followed by other statements that undercut any coercive effect. For example, quickly after making both statements, Officer Vanzanten informed Burvick that he "d[id]n't have to" consent to a search of his person, and "c[ould] refuse" the officers' requests. *Burvick*, 2025 WL 240976, at *4. Viewing these statements, as we must, in the context of the physical setting and other facts we have described, *see Lee*, 916 F.2d at 819, we cannot agree with the district court that they were sufficiently coercive to transform the encounter into a Fourth Amendment seizure.

Because Burvick undoubtedly was at some point seized, we must ask, then, when did the seizure—the *Terry* stop—occur? The government proposes that Burvick was seized when "Vanzanten moved to frisk [Burvick's] right-leg cargo pocket," about four minutes into Burvick's encounter with police, and two-and-a-

9

half minutes after Officer Vanzanten asked to see Burvick's security guard license. Gov't Br. at 30 n.7. But approximately one minute before moving to frisk Burvick, Officer Vanzanten made additional statements that might signal that Burvick was not free to leave: while one officer was examining his driver's license, Burvick expressed disbelief at the idea that he could have been "pulling a gun out on people" without having been arrested, and Officer Vanzanten replied, "Well, that's why we're here." Gov't Ex. 1 at 05:43–05:53. Burvick then told officers that the 911 caller had made a "false complaint," to which Officer Vanzanten responded, "Could be . . . but we have to investigate." *Id.* at 05:58–06:05. More so than Officer Vanzanten's earlier statements, and the "single statement" addressed in *Lee*, 916 F.2d at 819, these comments of Officer Vanzanten could be understood as suggesting that the officers were conducting an investigatory stop and Burvick was not free to leave.

In the end, however, we need not determine whether these statements were sufficiently coercive to transform the encounter at either of those precise points into a seizure, because, as explained below, by the time Officer Vanzanten said, "That's why we're here," and through the rest of Burvick's encounter with police, the officers had reasonable suspicion both to stop and to frisk Burvick.

II. **By the time the officers seized Burvick—at earliest when Officer Vanzanten stated that they were "here" to conduct an arrest—the officers had reasonable suspicion that Burvick had engaged in criminal activity and was armed and dangerous.**

As discussed above, under *Terry*, police may temporarily detain an individual for investigatory purposes if they have "reasonable suspicion" that the individual "has engaged in or is about to engage in criminal activity." *Hawkins*, 37

F.4th at 857. To conduct a frisk of the detained person, something more is needed: the officer "must have a reasonable suspicion not only that criminal activity is afoot, but also that the person suspected is armed and dangerous." *Weaver*, 9 F.4th at 139.

In determining whether police conduct was supported by reasonable suspicion, courts must "look at the totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis" for his suspicions. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An "inchoate suspicion or mere hunch" is not enough; the officer's suspicions "must be based on specific and articulable facts." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013). This determination must be made "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Id.*

The district court thoroughly addressed the various arguments raised by the government as justifying the officers' conduct, and ultimately concluded that the officers lacked reasonable suspicion for both the stop and the frisk. The court gave little weight to the 911 caller's allegations, concluding that the caller's report was "insufficiently reliable to justify Burvick's seizure." *Burvick*, 2025 WL 240976, at *15. The court also rejected the government's argument that Burvick gave "inconsistent and suspicious" responses to Officer Vanzanten's questions and demonstrated "evasive, nervous, and furtive behavior . . . both before and after questioning," and that such behavior justified the officers' seizure of Burvick and then their frisk. *Id.* at *17–*18. It instead described Burvick as "calm, respectful, and responsive to the officers' questions throughout the encounter," and found that he held the bag by his cargo pants pocket "naturally." *Id.* at *5, *16. The court

11

further dismissed as irrelevant Officer Vanzanten's observation that one of Burvick's cargo pants pockets was "weighing down heavier"; the court reasoned that, while "observations of a bulge with the shape or outline of a firearm-looking object" could provide officers with reasonable suspicion, observations of "weight" or a "heavy" area, in its view, could not. *Id.* at *23–*24.

We identify no clear error in the district court's relevant factual findings concerning Burvick's conduct and demeanor during the encounter. *See Anderson*, 470 U.S. at 573–74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). We disagree, however, with its review and assessment of the totality of the relevant circumstances. These include the details related by the 911 caller, in (notably) a series of two calls, and Officer Vanzanten's observations of Burvick's weighted pocket after an ambiguous interchange about the whereabouts of his security license.

As the district court acknowledged, the 911 report at issue here bore several of the same indicia of reliability as those identified by the Supreme Court in *Navarette v. California* as a basis for crediting an anonymous report to the police. 572 U.S. 393 (2014). First, the 911 caller used the 911 emergency system, which "has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id.* at 400.[2] Second, the

---

[2] The dissenters in *Navarette* argued that the use of the 911 system was due little weight, since the police officers there did not in fact know the caller's name, phone number, or address, "nor even the county from which the call was made," and "[t]here was no reason to believe that [the] 911 tipster [wa]s aware that [she was] readily identifiable." 572 U.S. at 405, 409 (Scalia, J., dissenting). Here, in contrast, the officers knew the 911 caller's phone

911 caller "claimed eyewitness knowledge" of the alleged crime. *Id.* at 399. She reported in her initial 911 call that a man "wearing glasses, an army fatigue shirt, a purple bandana around his wrist, and a yarmulke on his head" was threatening and yelling at people on the street and "saying he has a gun." *Burvick*, 2025 WL 240976, at *2. As the officers arrived at the scene roughly ten minutes later, the caller—making herself available in a follow-up call with the 911 dispatcher—reported further that the man in question had left the area as the officers approached and had begun to walk down a neighboring street. By following the caller's directions, the officers found Burvick, who exactly matched the caller's physical description of the individual she reported as having been making threats. This suggests strongly that the 911 caller was an eyewitness positioned to have seen the potentially unlawful conduct she initially reported. Third, the 911 caller's report was "contemporaneous," *Navarette*, 572 U.S. at 399: she called 911 as the alleged crime was "in progress," and spoke with the 911 dispatcher in real time as the officers approached Burvick. *Burvick*, 2025 WL 240976, at *2.

The district court concluded that the 911 report in this case was nonetheless distinguishable from the report in *Navarette* on the ground that the 911 caller in Burvick's case did not report "an ongoing emergency." *Id.* at *14. Respectfully, we are not convinced. The 911 caller in *Navarette* "reported that a vehicle had run her

---

number, and the 911 dispatcher was in fact able to contact her in a follow-up call soon after. The 911 caller also "indicat[ed] that [she] was willing to participate in an [in-person] follow-up interview with the officers" at a specific location. *Burvick*, 2025 WL 240976, at *13. Thus, while the 911 caller refused to tell the dispatcher and officers her full name, the record here suggests even more reliability than the call the Supreme Court depended on in *Navarette*. *Navarette*, 572 U.S. at 409 (Scalia, J., dissenting).

off the road." 572 U.S. at 395. Here, the 911 caller reported that a man was "threatening people saying he has a gun" in a public area. *Burvick*, 2025 WL 240976, at *14. Like dangerous driving, threats of gun violence can rapidly escalate and become life-threatening, and thus may reasonably be treated as an emergency before any injuries occur.

We need not decide, however, whether the 911 caller's allegations, standing alone, were sufficient to justify the seizure and frisk. The relevant inquiry is "whether all the facts taken together" supported the officers' suspicions—not whether "each fact considered in isolation" did. *Lee*, 916 F.2d at 820; *see also Arvizu*, 534 U.S. at 274–75 ("Although each of [a] series of acts was perhaps innocent in itself, . . . taken together, they [may] warrant[] further investigation.").

Some of the additional facts—in particular, Burvick's calm and non-threatening demeanor during his encounter with the police officers—tend to undermine any reasonable suspicion generated by the 911 call. The totality-of-the-circumstances test is not a one-way ratchet, where suspicious activity contributes to reasonable suspicion, but conduct inconsistent with the suspicion thus generated has no impact on the totality analysis. It is possible for the "presence of additional facts [to] dispel reasonable suspicion." *Kansas v. Glover*, 589 U.S. 376, 386 (2020). The totality test requires "courts to consider the whole picture," without "excising" any fact from the analysis. *District of Columbia v. R.W.*, 146 S. Ct. 1069, 1072–73 (2026). The district court's finding that Burvick's "demeanor and body language remained calm, respectful, and responsive to the officers' questions throughout the encounter" makes this a particularly close case. *Burvick*, 2025 WL 240976, at *16.

14

Nevertheless, there is no dispute that Burvick matched the 911 caller's "physical description precisely." *Id.* at *14. And by the time the officers seized Burvick on the public street (whether when Officer Vanzanten stated that they were "here" to conduct an arrest or when he moved to frisk Burvick), the officers had also observed that something in his cargo pants pocket was "weighing heavy." *Id.* at *5. While a weighted pocket would not by itself be cause for suspicion and alarm, in this case it tended to corroborate the 911 caller's allegation that a man who exactly matched Burvick's physical description had been threatening people, including by yelling that he was carrying a gun.[3] It was reasonable for this observation to strengthen the officers' assessment that the 911 caller's accusation was credible and that the suspect she described was Burvick. Burvick's demeanor during the interaction did not dispel the suspicion arising from this corroborating observation. Though this is a close case, taken together, the 911 caller's detailed allegations and Burvick's visibly weighted pocket provided the officers with reasonable suspicion that Burvick was both (1) engaged in criminal activity—namely, that he had been harassing and threatening people on the street, as the 911 caller reported, only minutes before the officers arrived at

---

[3] Burvick's subsequent explanations about the visible weight in his cargo pants pocket did nothing to mitigate these suspicions. When asked by Officer Vanzanten what was causing the pocket to weigh heavy, he replied, "My phone and stuff." *Burvick*, 2025 WL 240976, at *5. Officer Vanzanten observed, however, that Burvick had a phone in his back pocket. Burvick in fact had two phones, and one of them was eventually found with the firearm in his side cargo pocket. But it is nonetheless reasonable that the observation and his explanation would have heightened officers' concerns at the time. Reasonable suspicion must be assessed at the moment of the seizure's "inception," *Terry*, 392 U.S. at 20, not with the benefit of hindsight. And officers "need not rule out the possibility of innocent conduct" before acting. *Arvizu*, 534 U.S. at 277.

the scene, and (2) armed and dangerous—in that he was in fact carrying a gun.[4]

We therefore conclude that neither the *Terry* stop nor the frisk was unlawful.[5]

For the foregoing reasons, the order of the district court granting the motion to suppress is **REVERSED** and the case is **REMANDED**.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court

---

[4] Because Burvick previously told the officers that he did not have a "license to carry," it was also reasonable for them to suspect that he was actively committing another crime—illegally carrying a firearm. *Burvick*, 2025 WL 240976, at *19.

[5] Burvick argues in the alternative that the officers violated the Fourth Amendment by commanding him to leave the curtilage of this home—the front garden—without probable cause. But Officer Vanzanten did not order Burvick to leave the curtilage of his home by requesting that he "come here for a second": the district court referred to the statement as a "question[]"and "police request," as well as a "directive," and concluded that Burvick's response (that is, coming onto the public sidewalk and speaking with the officers) was "consensual." *Burvick*, 2025 WL 240976, at *3, *9–*10. We agree. Just as police may "approach a home, knock on the door, and try to speak with the occupants" without a warrant or probable cause, they may also seek to initiate consensual encounters with individuals who are in the curtilage of their home. *United States v. Allen*, 813 F.3d 76, 85 (2d Cir. 2016).

16